**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION**

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**                          **PLAINTIFF**

**v.**                          **CASE NO.: 2:11-CV-02153**

**OLD DOMINION FREIGHT LINE, INC.**                          **DEFENDANT**

<u>**MEMORANDUM OPINION**</u>

This matter came on for a jury trial the week of January 12, 2015.  The jury was asked to determine whether Mr. Charles Grams ("Grams"), on whose behalf Plaintiff Equal Employment Opportunity Commission ("EEOC") brought suit, had been discriminated against by his former employer, Defendant Old Dominion Freight Line, Inc. ("Old Dominion"), in violation of the Americans with Disabilities Act ("ADA").  At the conclusion of the four-day trial, the jury was instructed on the applicable law, and the case was submitted on interrogatories.  When asked, "Do you find by the greater weight of the evidence that Old Dominion discriminated against Grams because of a disability in violation of the Americans with Disabilities Act ('ADA')," the jury responded in the affirmative and awarded Grams $119,612.97 in back pay.   On January 16, 2015, The Court entered Judgment on the jury's verdict.

In its post-trial motions, the EEOC asks the Court to do four things:  determine whether Old Dominion's self-reporting policies violate the ADA, consider enjoining Old Dominion from continuing to enforce those policies, order Old Dominion to reinstate Grams and pay him all  prejudgment interest associated with the jury's award of back pay, and

1

reimburse the EEOC for certain costs.  Old Dominion opposes all of the EEOC's requests and asks the Court to vacate the jury verdict and enter judgment as a matter of law as to Old Dominion, or, in the alternative, to order a new trial or to reduce the amount of the jury's verdict, which Old Dominion argues is excessive and unsupported by the evidence. As to the EEOC's calculation of its taxable costs, Old Dominion makes specific objections. The Court will address each of these motions in turn.

## I.  LEGALITY OF OLD DOMINION'S POLICY

The Court's initial task is to rule on the EEOC's request for injunctive relief as to Old Dominion's company policy regarding the self-reporting of an alcohol problem ("Old Dominion's Policy," or sometimes simply the "Policy") violates the ADA. And, more specifically, as a threshold matter, whether Old Dominion's  Policy violates the ADA as a matter of law.

Towards the end of the jury trial, after the parties rested their respective cases, the Court conducted a jury instruction conference with the attorneys and announced conclusions of law from the bench, albeit in an abbreviated form.  The Court stopped short, however, of making a final ruling concerning the EEOC's request for a permanent injunction as a matter of law.  The Court previewed its legal rulings in order to explain why the vast majority of the parties' proposed jury instructions addressed issues of law for the Court, and thus would not be submitted to the jury. The Court determined that the jury's sole task was to decide whether Grams had been the victim of workplace discrimination due to a disability and, if so, to arrive at an award of compensatory damages.  The final jury instructions focused on the elements of a disability discrimination claim pursuant to the

ADA.[1]  It is now for the Court to determine whether Old Dominion's company-wide Policy violates the ADA as a matter of law, and if so, whether the Policy should be enjoined.  The following findings of fact and conclusions of law underlie the Court's reasoning.

## A.  Findings of Fact

1.    Old Dominion is a for-hire motor carrier company providing worldwide transportation services.

2.    Old Dominion has a written Policy concerning what to do when a driver self-reports an alcohol problem.[2]

3.    According to the Policy, when a driver self-reports an alcohol problem that does not implicate prohibited conduct, he  is immediately suspended from driving and instructed to consult with a Substance Abuse Professional ("SAP") qualified by the Department of Transportation ("DOT"), as per 49

---

[1] The parties submitted approximately 75 proposed jury instructions to the Court.  There was substantial confusion and disagreement between the parties as to which claims were appropriate for the Court to decide, and which were appropriate for the jury. In the end, the Court gave 12 final jury instructions (Doc. 279), only one of which was based on an applicable regulation pertaining to driver qualifications.

[2] Although the parties stipulated that the Policy was not in writing, *see* the trial transcript at Doc. 300-1, p. 153, contrary evidence was presented during the trial by Brian Stoddard, Old Dominion's former Vice President of Safety and Personnel.  Stoddard testified that around 1998, he participated in a meeting with the President, Senior Vice President of Operations, Executive Vice President, and General Counsel of Old Dominion.  *See* Doc. 300-2, pp. 186-190.  Following that meeting, Stoddard "wrote out the steps that [the company] should take in the future" when an employee self-reported an alcohol problem, and this "protocol" became the Policy.  *Id.* at p. 190.  According to Stoddard's testimony, the Policy was as follows: once an employee self-reported an alcohol addiction, he "would have to see a substance abuse professional [SAP] for counseling," then "be removed from safety sensitive positions," then "go into a rehab or treatment program," and only after completion of that program could potentially be cleared to "come back to work in a *nondriving position*, on the dock, for example, where he is managed and supervised."  *Id.* (emphasis added).

C.F.R. §§ 40.281(a) and 40.285(a).

4.      If the SAP concludes that the driver has a "current clinical diagnosis of alcoholism," Old Dominion's Policy then considers the employee to be permanently disqualified and prohibited from ever returning to a driving position, regardless of the circumstances, and without regard to any potential accommodations.[3]

5.      Old Dominion's Policy has never been widely disseminated throughout the company, even to supervisors, and is not provided or explained to drivers. Old Dominion believes–correctly–that its drivers' knowledge of the Policy would likely discourage them from self-reporting such problems.

6.      Under Old Dominion's Policy, a driver who has been suspended due to a current clinical diagnosis of alcoholism may be considered for a non-safety-sensitive, non-driving position, but only if the driver first provides proof to Old Dominion that he has entered into a rehabilitation or treatment program for alcohol abuse.

7.      Grams, the former Old Dominion driver who prevailed at the jury trial of this matter on his direct disability claim, never violated the DOT drug and alcohol regulations listed at 49 C.F.R. §§ 382.201-382.215 ("Subpart B"), from the date Old Dominion hired him on November 29, 2001, until he was suspended on June 29, 2009, following his self-reporting of alcohol addiction.

---

[3] Brian Stoddard, the Vice President of Safety and Personnel, affirmed on cross-examination that "[w]hen a person comes forward and admits they have an addiction to alcohol or drugs, yes, they will not drive again. That is our policy." *See* Doc. 300-2, p. 222.

8.     Old Dominion was aware that Grams desired to return to work as a dock worker for Old Dominion, at least temporarily, until he was able to find a job working as a driver for another company.

9.     Old Dominion believes that its Policy conforms with and is mandated by DOT regulations.

10.    Old Dominion believes that its Policy is further justified by statistical and anecdotal proof that the relapse rate on alcohol addiction is very high.

11.    Old Dominion's corporate leadership did not consider the ADA when implementing and enforcing its Policy.

12.    Old Dominion's application of its Policy resulted in Grams' termination, which the jury found was an adverse employment action that violated the ADA.

## B.  Conclusions of Law

According to the DOT's implementing regulations at 49 C.F.R. §§ 40.281-313 (known as "Subpart O"); and 49 C.F.R. §§ 382.201-215 (known as "Subpart B"), a driver of a commercial vehicle who engages in certain prohibited conduct concerning the misuse of alcohol will be ineligible to return to a safety-sensitive position unless he first completes an evaluation, referral, and education/treatment process, as directed by a DOT-certified SAP.   The "prohibited conduct" listed in Subpart B includes:  reporting for duty while having a blood alcohol concentration of 0.04 of greater, using alcohol while driving, driving within four hours of using alcohol, using alcohol sometime within eight hours following an accident, or refusing to submit to a random alcohol test.  *See* 49 C.F.R. §§ 382.201-382.215.

According to Subpart O, "when [an employee] ha[s] violated DOT drug and alcohol regulations, [the employee] cannot again perform any DOT safety-sensitive duties for any employer until and unless [the employee] complete[s] the SAP evaluation, referral, and education/treatment process set forth in this subpart and in applicable DOT regulations." 49 C.F.R. § 40.285(a). The procedure in Subpart O describes the general rule that an employer must follow when a driver has violated DOT regulations by engaging in one or more prohibited acts.   When a driver violates Subpart B, compliance with Subpart O is mandatory, and the employer lacks discretion to allow the employee to return to driving unless the employee first successfully completes the SAP-recommended evaluation, referral, and treatment process.[4]

There is a regulatory exception to the general rule.  Employers may implement written policies concerning the self-reporting of "alcohol misuse."[5]  *See* 49 C.F.R. § 382.121(a).  If the policy meets the  requirements set forth in §382.121(b), then the SAP evaluation and treatment protocols found in Subpart O do not apply, and the employee is

---

[4] In the absence of a company policy to the contrary, an employer retains the discretion and would be within its rights to terminate an employee who actually engaged in prohibited conduct.  Old Dominion's Policy goes beyond the DOT regulations by prohibiting the driver from ever returning to the driver's seat, even though the driver has *not* engaged in conduct prohibited by Subpart B.

[5] The term "alcohol misuse" as it appears in the regulations,  49 C.F.R. § 382.121, is not defined and creates some confusion as to the intended application.  The regulation certainly leaves room for the term to be defined by the employer's policy, provided that self-reporting can not used as a means to avoid alcohol testing and/or situations where the employee has already started performing safety sensitive functions.  Self-reporting a problem with alcohol abuse is contemplated by this regulation inasmuch as the goal is to bring potential problems to light—prior to safety sensitive functions being performed under the influence of alcohol.

not subject to all of the collateral consequences of violating the DOT's alcohol regulations. A regulatory compliant policy must, among other things, "prohibit the employer from taking adverse action against an employee [who makes] a voluntary admission of alcohol misuse."  49 C.F.R. § 382.121(b)(1).

According to the Federal Motor Carrier Safety Administration's ("FMCSA") interpretive guidance, the purpose of these self-reporting policies is to encourage employees to disclose alcohol addiction problems before they impact job performance. The public policy expressed by the DOT in promulgating these regulations is as follows:

> The FMCSA's objective is to deter employees from operating a CMV [Commercial Motor Vehicle] if they are using a controlled substance or misusing alcohol.  If an employer has a self-admission program, the intent of that program is to allow a driver to disclose a problem and not be subject to DOT sanctions.  However, the employer's program is not an excuse for an employee to abuse the good faith intent of the program.  The goal is to encourage employees to disclose a drug or alcohol problem prior to reporting for duty on any given day.  Once an employee has reported for duty and participated in a safety-sensitive function, it will be too late to self-disclose under the provisions of the employer's self-admission program.

66 FR 43097-01.

In the case at bar, it is undisputed that Grams did not engage in any prohibited conduct constituting a violation of Subpart B.  He was not, therefore, subject to the general rule explained above, as set forth at 49 C.F.R. § 40.285(a), which would require him to submit to evaluation and treatment as recommended by a DOT-certified SAP.  Grams could not avail himself of a regulatory compliant self-reporting policy, because Old Dominion had intentionally failed to adopt such a policy.  Grams did, however, notify his supervisor prior to reporting for driving duty that he had been abusing alcohol on his personal time and thought he was disabled by alcoholism.  The Court observes that in self-

reporting an alcohol addiction *before* engaging in an on-the-job violation of the DOT alcohol regulations, Grams was fulfilling the public-policy goals established by the DOT in enacting 49 C.F.R. § 382.121. In particular, Grams' act of self-reporting presumably highlighted to his employer a potential problem before it developed into an actual safety hazard for the motoring public.

Old Dominion's Policy is not intended to be construed as a "written employer-established voluntary self-identification program or policy," as defined in 49 C.F.R. § 382.121(a)-(b). Rather, the Policy is intended as a protocol known only to corporate leadership and not to be disseminated company-wide, for the purpose of allowing Old Dominion to take adverse action against employees who voluntarily disclose alcohol abuse issues. When Grams self-reported his alcohol addiction, corporate leadership treated him as though he had *actually engaged* in prohibited conduct. Grams was told that, because of the company's Policy, he would be prohibited him from ever returning to the driver's seat.[6]   Old Dominion's Policy contravenes public policy and erroneously conflates the temporary suspension resulting from a "current clinical diagnosis of alcoholism" with complete discretion  to effectively terminate all self-reporting drivers without regard to the ADA.

In considering these material respects of Old Dominion's Policy, the Court finds that it clearly imposes more far-reaching and severe consequences on drivers than does the DOT. Pursuant to 49 C.F.R. § 382.601, employers are generally required to promulgate

---

[6] Old Dominion did offer Grams a part-time, non-safety-sensitive position as a loading dock worker, contingent upon his agreement to complete the SAP referral and treatment protocol. Subpart O, however,  does not even apply to non-safety-sensitive positions.  49 C.F.R. § 40.285.

policies on the misuse of alcohol, with the goal of educating drivers as to the specific conduct prohibited under Subpart B and the consequences contemplated under Subpart O.  But Old Dominion's Policy ventures past the DOT's regulations on safety-sensitive jobs into territory properly governed by the ADA.

The DOT does regulate driver qualifications.  49 C.F.R. § 391.11(b)(4) and § 391.41(b)(13), read in combination, provide that a driver is not physically qualified to drive a commercial motor vehicle unless he "[h]as no current clinical diagnosis of alcoholism." 49 C.F.R. § 391.41(b)(13).  A "current clinical diagnosis," as explained to DOT medical examiners when discussing alcoholism, is a term that:

> . . . is specifically designed to encompass a current alcoholic illness or those instances where the individual's physical condition has *not fully stabilized*, regardless of the time element.  If an individual shows signs of having an alcohol use problem, he or she should be referred to a specialist.  ***After counseling and/or treatment, he or she may be considered for certification***.

49 C.F.R. § 391.43 (emphasis added).

The Court agrees with Old Dominion that once a driver obtains a current clinical diagnosis of alcoholism, he is not medically qualified to drive and is appropriately suspended from driving.  However, the inquiry does not end there.  "To be a qualified individual within the meaning of the ADA, an employee must (1) possess the requisite skill, education, experience, and training for his position, and (2) be able to perform the essential job functions, *with or without reasonable accommodation*."  *Brannon v. Luco Mop Co.*, 521 F.3d 843, 848 (8th Cir. 2008) (internal quotations and citations omitted).  Once Old Dominion identified Grams' disability of alcoholism—and since Old Dominion lacked a DOT-qualifying self-identification policy in place to provide structure and guidance—Old

9

Dominion should have considered, first, whether Grams had violated Subpart B of the DOT's alcohol regulations, such that he was automatically subject to the SAP referral and treatment protocols.  Next, since Grams had not violated  DOT regulations, but had only reported an alcohol addiction, Old Dominion should have considered whether Grams was disabled by alcoholism and—potentially—could have driven again if provided a reasonable accommodation.

When a reasonable accommodation is requested, "the scope of the employer's obligation in this regard is determined through an informal, interactive process between the employer and the employee, identifying the limitations arising from the disability and potential reasonable accommodations that could overcome those limitations." *Ballard v. Rubin*, 284 F.3d 957, 960 (8th Cir. 2002) (internal quotation and citation omitted).

Old Dominion's requirement that Grams participate in and complete an SAP-approved treatment plan was not a reasonable accommodation for his disability because it failed to contemplate at least a potential return to driving.[7]  Instead, Old Dominion viewed Grams' participation in the treatment program as a prerequisite for qualifying for a non-safety-sensitive position as a dock worker.  The reasonable accommodation analysis requires that an employer consider if an employee would be otherwise qualified to perform his *current or comparable* job with or without reasonable accommodation.  *See Rehrs*, 486

---

[7] The Court does not mean to imply that it would be improper or illegal for an employer to require a driver to participate in an SAP-approved treatment plan as a reasonable accommodation for alcoholism.  An employer is only required to provide a reasonable accommodation, not the particular accommodation the employee requests or deserves. *Rehrs v. Iams Co.*, 486 F.3d 353, 359 (8th Cir. 2007). The Court merely observes that a referral to an SAP is not *mandated* by DOT regulations when (1) a driver self-reports alcohol abuse but has not otherwise violated Subpart B, and (2) the driver is not subject to an employer-created self-reporting policy as described in 49 C.F.R. § 382.121.

F.3d at 359 ("If an employer has offered reassignment as a reasonable accommodation, then the employee must offer evidence showing both that the position offered was inferior . . . and that a comparable position for which the employee was qualified was open."). Here, the evidence at trial was that the dock worker position was inferior because it was a part-time position only, paid substantially less than the driving position, and did not include health benefits.

Under the ADA, an employer is not permitted, as Old Dominion did here, to summarily decide without engaging in any interactive process that no accommodation is potentially available to permit an alcoholic employee to eventually return to driving, particularly in light of the fact that DOT regulations expressly contemplate the possibility of a return to driving even after a clinical diagnosis of alcoholism.   *See* discussion of alcoholism at 49 C.F.R. § 391.43.

Old Dominion falsely believed it could fashion its Policy with respect to its employees in safety-sensitive positions without any reference at all to the ADA.  This belief came from a misreading of the ADA's "safe harbor" provision, which exempts "employees . . . employed in a transportation industry subject to [DOT] regulations, including [exempting them from] complying with such regulations (if any) that apply to employment in sensitive positions in such an industry . . . ." 42 U.S.C. § 12114(c)(5)(C).  The safe harbor does not apply, however, when an employee engages in some aspect of safety-sensitive employment that is *not* regulated by the DOT.  In such a scenario, the ADA's protections would fill in the gap and provide protection to the employee.

It follows that when Old Dominion chose to put in place a Policy that was not DOT-compliant with respect to self-reporting (i.e. a policy that mandated adverse employment

action against self-reporting drivers), and when Grams then self-reported an alcohol problem without having engaged in an actual on-the-job violation of the DOT's substance abuse regulations, the ADA filled in the regulatory gap not covered by—and in fact contradicted by—the DOT regulations.  Considering those facts, Old Dominion erred in failing to consider whether Grams was disabled by alcoholism under the ADA and subject to the statute's protections.

Even though Old Dominion was required to engage in an individualized analysis of Grams' coverage under the ADA, the company's hands were not tied when it came time to make the ultimate critical assessment as to whether Grams had undergone sufficient treatment so as to requalify to drive.   Moreover, as explained previously, if Old Dominion had crafted a DOT-compliant self-reporting policy, the process for evaluating and treating Grams would have been well-defined by DOT regulations, and this lawsuit might not have occurred.

The crucial failure of Old Dominion's Policy—which applies to self-reporting drivers who have not otherwise engaged in prohibited conduct—is that it fails to consider reasonable accommodations and at least the possibility of a return to driving.  This conclusion is entirely consistent with the case law cited by the parties, because an employer still retains the ultimate discretion to decide whether a driver is qualified to return to work in any capacity *after* being offered a reasonable accommodation.  *See Wyatt v. J.B. Hunt Transp.*, 2009 WL 652723 (E.D. Ark. Mar. 12, 2009), *aff'd*, 366 Fed. Appx. 718 (8th Cir. 2010) (employer with a DOT-qualifying self-reporting policy did not violate the ADA when it terminated driver after offering a reasonable accommodation, but driver failed to successfully complete the treatment program); *Larson v. United Natural Foods West, Inc.*,

12

518 Fed. Appx. 589, 591 (9th Cir. 2013) (affirming lower court's finding that employer did not violate the ADA when it considered unreasonable a proposed accommodation for an alcoholic driver consisting of six months of treatment with the possibility of an additional 12 weeks); *Jarvela v. Crete Carrier Corp.*, 754 F.3d 1283 (11th Cir. 2014) (per curiam) (affirming district court's finding that employer did not violate ADA when it allowed driver to take leave to participate in intensive outpatient treatment program, but later determined that driver was not qualified to return to driving after he completed the program).

The interplay between the ADA and the DOT regulations can be summarized as follows.  The ADA itself makes clear that any employee in a safety-sensitive position who is subject to DOT regulations regarding the use of alcohol must comply with those regulations, without reference to the ADA.  42 U.S.C. § 12114(c)(5)(C).  However, when an employer's policies impose burdens on disabled employees that are not mandated by the DOT due to safety concerns, a close look at those policies is warranted in order to determine whether the policies otherwise comply with the ADA.  In the case at bar, Old Dominion created a Policy that imposes greater restrictions on drivers who self-report alcohol abuse than those restrictions imposed by the DOT.

Accordingly, the Court finds as a matter of law that:

1.    Old Dominion's Policy, wherein it fails to consider a driver for a reasonable accommodation once the driver has been given a current clinical diagnosis of alcoholism, violates the ADA;

2.    Any proposed accommodation that does not provide the driver with at least the possibility of a return to his former job or a comparable job is not reasonable as a matter of law and violates the ADA; and

13

3.    An employer with a self-reporting policy that fails to qualify under 49 C.F.R. § 382.121 is not, as a matter of law, required to refer a self-reporting driver to a SAP for referral and treatment, as set forth in Subpart O (49 C.F.R. §§ 40.281 and 40.285), unless the driver has committed a violation of Subpart B (49 C.F.R. §§ 382.201-215) of the DOT regulations; however, the employer is at liberty to consider the SAP treatment process as a potential reasonable accommodation pursuant to the ADA.

## II.  REQUEST FOR INJUNCTIVE RELIEF

### A.  Legal Standard

"The standard for granting a permanent injunction is essentially the same as for a preliminary injunction, except that to obtain a permanent injunction the movant must attain success on the merits."  *Bank One, Utah v. Guttau*, 190 F.3d 844, 847 (8th Cir. 1999). According to the Eighth Circuit's guidance in *Dataphase Systems, Inc. v. C.L. Systems, Inc.*, a district court must consider the following four factors when determining whether a permanent injunction should issue:  the threat of irreparable harm to the movant, the balance between this harm and the harm to the other party if the injunction is granted, the probability of movant's success on the merits, and the public interest.  640 F.2d 109, 113 (8th Cir. 1981) (en banc).

Once it has been determined that an employer has "intentionally engaged in . . . an unlawful employment practice," the court "may enjoin [the employer] from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include . . . equitable relief as the court deems appropriate." 42 U.S.C. §

14

2000e–5(g)(1); *see also* 42 U.S.C. § 12117(a) (making § 2000e–5(g) applicable to ADA claims brought by the EEOC).   "The EEOC represents the public interest when litigating claims, and, through injunctive relief, seeks to protect not only the rights of the individual claimant, but those of similarly situated employees by deterring the employer from future discrimination."  *EEOC v. Massey Yardley Chrysler Plymouth*, 117 F.3d 1244, 1253 (11th Cir. 1997).   If discrimination is established, the Court has broad discretion to issue injunctive relief.  *See Briscoe v. Fred's Dollar Store,* 24 F.3d 1026, 1028 (8th Cir. 1994).

## B.  Discussion

The Court in its discretion finds that a permanent injunction should issue prohibiting Old Dominion from enforcing its Policy against drivers, as that Policy violates the ADA. The EEOC's request for injunctive relief is justified through the application of the *Dataphase* factors.  640 F.2d at 113.

First, allowing Old Dominion to continue to enforce its Policy creates the threat of irreparable harm to drivers.  The Policy deprives drivers who self-report alcohol addiction of their rights pursuant to the ADA, which translates into a deprivation of their continued—potential—employment as drivers for Old Dominion.

Second, the balance between the harm suffered by drivers who self-report alcohol addiction and the harm to Old Dominion if the injunction is granted weighs in favor of issuing the permanent injunction.  Once the permanent injunction is granted, Old Dominion will still retain the discretion to determine whether a requested accommodation is reasonable under the circumstances and whether, after completing treatment, a driver who has been diagnosed with alcoholism has once again become qualified to resume his

driving duties.

Third, the EEOC has prevailed on the merits of disability discrimination claims it brought on behalf of Grams.  This fact weighs in favor of enjoining the underlying discriminatory Policy.

Fourth, as previously stated,[8] enjoining the Policy supports the public's interest in encouraging drivers to self-report alcohol addiction before becoming involved in accidents and endangering the safety of others.  The objective should be to bring such addictions out of the closet so that they may be dealt with openly.  Old Dominion's Policy, by contrast, has the chilling effect of silencing drivers with addictions and pushing them deeper into the closet.

The Court is convinced that issuing a permanent injunction is necessary to compel Old Dominion's compliance with federal law. Accordingly, the Court finds that Old Dominion's Policy violates the ADA in that it fails to consider a driver for a reasonable accommodation once the driver has been given a current clinical diagnosis of alcoholism. The Court also finds that Old Dominion's Policy of offering a driver disabled by alcoholism an accommodation that does not provide the driver with at least the possibility of a return to his former job or a comparable job is not reasonable as a matter of law and violates the ADA.

Therefore, **IT IS ORDERED** that the Policy as described above is **PERMANENTLY ENJOINED**.  The Court declines to order further injunctive relief as requested by the EEOC in its Motion (Doc. 291, pp. 18-21).

---

[8] *See* the public policy as excerpted above in section I.B. by the FMCSA, 66 FR 43097-01.

### III.  OLD DOMINION'S ALTERNATE REQUESTS
### FOR JUDGMENT AS A MATTER OF LAW OR FOR A NEW TRIAL

Old Dominion moved for judgment as a matter of law, pursuant to Federal Rule of Civil Procedure 50(a), on January 14, 2015, following the presentation of the EEOC's case-in-chief.  The motion was filed of record, and Old Dominion had the opportunity to present oral argument.  After both parties had been heard, the Court granted the motion in part as to the dismissal of the EEOC's claim for punitive damages, but deferred ruling on the remainder of the motion.  Shortly thereafter, the jury returned with a verdict in the EEOC's favor.  Old Dominion now renews its Rule 50 Motion and argues that the EEOC failed to offer evidence sufficient to demonstrate that Grams: (1) was substantially limited in a major life activity so as to be considered disabled pursuant to the ADA; (2) was a "qualified individual" with a disability pursuant to the ADA; and (3) was denied a reasonable accommodation by Old Dominion.

After careful consideration, the Court finds that Old Dominion's Motion for Judgment as a Matter of Law should be **DENIED**, as there was sufficient evidence presented at trial for a reasonable jury to conclude that Grams was disabled and suffered an adverse employment action due to disability discrimination.  "Judgment as a matter of law is appropriate only when all of the evidence points one way and is susceptible of no reasonable inference sustaining the position of the nonmoving party." *Howard v. Mo. Bone & Joint Ctr., Inc.*, 615 F.3d 991, 995 (8th Cir. 2010) (internal quotation marks and citation omitted).

Here, the EEOC presented evidence sufficient to show that Grams' alcoholism substantially limited several major life activities, including but not limited to walking,

standing, thinking, communicating, and caring for himself.  The Eighth Circuit has recognized that alcoholism may qualify for protection as a disability under the ADA when it limits a major life activity.  *See Miners v. Cargill Commc'ns, Inc.*, 113 F.3d 820, 823 (8th Cir. 1997) (citing *Crewe v. U.S. Office of Pers. Mgmt.*, 834 F.2d 140, 141 (8th Cir. 1987) ("At the outset there can be little doubt that alcoholism is a handicap for the purposes of the Act.").

Grams testified that he drank throughout every weekend—from Friday to Sunday—and whenever possible during the week.  Grams also testified that during the week, if his shift ended at 4:00 p.m. or earlier, he would stop at the liquor store and purchase a half-pint of liquor, and then proceed to consume it over the course of the next 30 minutes.  (Doc. 300-1, p.181).  On weekends, Grams would drink one half-gallon plus one pint of liquor.  *Id.* at p. 182.  When he would start drinking on Friday evenings after work, he would continue to drink until he blacked out or passed out.  *Id.*  When he would drink in this manner, he was unable to walk, talk, or communicate with his family.  (Doc. 300-2, p. 9).  He was unable to control his drinking on the weekends and would remain heavily intoxicated for long periods of time.  He would stumble and fall down when walking, urinate on himself without knowing it, and fail to take care of his personal hygiene on a regular basis.  *Id.* at pp. 9-10.  Mrs. Grams also testified at trial and corroborated Grams' testimony as to the effects his alcoholism had on his daily life.  *See* Doc. 300-3, pp. 43-50.

In all, the evidence was overwhelming that Grams' alcohol addiction was severe and easily met the ADA's definition of a disability.  The Court therefore rejects Old Dominion's argument that Grams' alcohol addiction was not significant or severe enough to

substantially limit any major life activity simply because Grams was capable of performing his job and refraining from drinking during the workday.

Next, the evidence presented at trial was sufficient for the jury to conclude that Grams was a "qualified individual" with a disability, as defined by the ADA. "To be a qualified individual within the meaning of the ADA, an employee must (1) possess the requisite skill, education, experience, and training for his position, and (2) be able to perform the essential job functions, *with or without reasonable accommodation*." *Brannon v. Luco Mop Co.*, 521 F.3d 843, 848 (8th Cir. 2008) (internal quotations and citations omitted) (emphasis added).

As previously explained, Grams' self-reporting of alcohol addiction did not trigger the SAP-evaluation protocols associated with a violation of Subpart B of the DOT's safety regulations. Nevertheless, Old Dominion ordered Grams to be evaluated by a SAP, and the SAP ultimately diagnosed him with alcoholism. Although that diagnosis temporarily barred Grams from driving, it should not have resulted in a permanent bar. It is clear that at the time of his diagnosis, Grams possessed the skill, education, experience, and training to be a truck driver. It is also clear that Old Dominion erred in treating Grams as though he had actually violated Subpart B, when in actuality, he reported an alcohol problem to his superiors before any safety violation had occurred. Under these circumstances, Old Dominion had an obligation to consider whether Grams was disabled by alcoholism according to the ADA and to perform an individualized analysis of his condition in order to determine whether a reasonable accommodation were available that would enable him to perform the essential functions of his job.

Grams presented sufficient evidence at trial that a reasonable accommodation was

19

possible. For the reasons explained above, Old Dominion is incorrect that it was not obligated to consider any reasonable accommodation due to the SAP's diagnosis of alcoholism. The Court therefore finds that the jury had a rational basis for concluding that Grams could have performed the essential functions of his job as a driver, with a reasonable accommodation, at the time Old Dominion refused to consider returning him to driving and terminated his employment.

Lastly, the Court rejects Old Dominion's claim that there was insufficient evidence presented at trial that Old Dominion denied Grams a reasonable accommodation. Old Dominion argues unconvincingly that Grams neither wanted nor requested a leave of absence to get substance abuse treatment, but instead asked for a single day off on June 29, 2009—which he received. Grams testified at trial that he called his supervisor, Tilden Thornton, on June 29 to ask for the day off, and he was immediately suspended without pay after that. Grams also testified that he called Vice President of Safety and Personnel Brian Stoddard on June 29 and told him that he needed help with an alcohol problem and hoped he could get time off to receive treatment. (Doc. 302-1, p. 6). Stoddard verified when he testified at trial that Grams did indeed call him to say he needed help with an alcohol problem and that Stoddard was aware Grams needed time off to get that help. *Id.* at p. 34. Stoddard further testified that he followed "standard operating procedure" and decided he would permanently ban Grams from returning to the driver's seat after Stoddard received an email from Grams' terminal manager about the self-report. (Doc. 300-2, pp. 221-22). Stoddard also affirmed on cross-examination that "[w]hen a person comes forward and admits they have an addiction to alcohol or drugs, yes, they will not drive again. That is our policy." *Id.* at p. 222.

20

Old Dominion also contends that its offer to Grams of employment in a part-time dock worker position was a reasonable accommodation.  The jury, however, heard evidence that this offer was not a reasonable accommodation because the dock worker position was part-time, paid only 60% of the hourly salary that Grams used to receive as a truck driver, and did not come with health insurance benefits.  (Doc. 302-1, p. 2).

With regard to Old Dominion's Motion for a New Trial, the Court finds that the evidence was sufficient to establish all the essential elements of a claim of discrimination pursuant to the ADA.  In particular, the Court's jury instructions explaining the elements of the ADA claim were adequate to inform the jury as to the relevant law.  Old Dominion takes issue with the fact that the Court did not provide the jury with a copy of all the DOT regulations Old Dominion submitted in its packet of proposed jury instructions.  Because the only claim for the jury to decide was Grams' ADA discrimination claim, there was only one DOT regulation that was necessary for the jury to consider in order to determine liability with respect to this claim.  The Court provided an accurate explanation of this DOT regulation to the jury in Final Instruction 10.  *See* Doc. 279, p. 13.  As no other DOT regulation was necessary given the issues submitted to the jury, none other was given as a final instruction.

The Court surmises from the verdict that the jury was not convinced by Old Dominion's argument—made repeatedly throughout trial—that Grams was forever disqualified from driving because he received a current, clinical diagnosis of alcoholism.  There is, accordingly, no basis for granting a new trial pursuant to Rule 59(a), and Old Dominion's Motion (Doc. 294) is therefore **DENIED**.

## IV.  GRAMS' ENTITLEMENT TO REINSTATEMENT OR FRONT PAY

Old Dominion contends that Grams is not entitled to reinstatement as a driver.  The company's sole argument is that the July 2009 clinical diagnosis of alcoholism by the SAP is technically still in effect, and, therefore, Grams remains medically disqualified from driving a truck at the present time, according to DOT regulations.   The Court rejects this argument.

Although Grams did receive a clinical diagnosis of alcoholism in 2009, and he never completed the treatment program that was prescribed by the SAP at that time, it is patently absurd to suggest that this six-year-old diagnosis renders Grams medically disqualified from driving a truck for Old Dominion at present.  First and foremost, the Court has already determined that Old Dominion's referral of Grams to an SAP following his self-reporting of alcohol addiction was not required by DOT regulations, as Grams had not violated any DOT regulations regarding alcohol misuse at that time.  Once the SAP evaluated Grams and gave him a clinical diagnosis of alcoholism, however, Old Dominion had no choice but to temporarily suspend Grams from driving.  However, Old Dominion's immediate decision to impose a permanent driving prohibition violated the ADA.  In particular, Old Dominion illegally:  (1) banned Grams from ever returning to his position as a driver; (2) refused to consider a reasonable accommodation that would provide a potential pathway back to his requalification for driving; and (3) required that he complete the SAP-prescribed treatment program before he could take even a non-driving, non-safety-sensitive position with the company.

The Court must consider whether Grams is qualified now, in 2015, to drive a commercial vehicle.  It appears that the only argument in favor of his disqualification is the

22

SAP diagnosis from 2009.  The uncontroverted evidence is that Grams has maintained his sobriety since no later than August 5, 2009; that he holds a  Medical Examiner's certificate to drive a commercial vehicle, *see* Doc. 316-1; and that he has been employed as a licensed commercial truck driver for PepsiCo a/k/a New Bern Transport from mid-2011 until the present.[9]

In deciding whether to reinstate Grams or award front pay, it appears that the Eighth Circuit finds a front-pay award to be an exceptional remedy that should only be granted when reinstatement is "impractical or impossible."  *Mathieu v. Gopher News* Co., 273 F.3d 769, 778 (8th Cir. 2001) (citations omitted); *Sellers v. Mineta*, 358 F.3d 1058, 1063 (8th Cir. 2004) ("Front pay is a disfavored remedy that may be awarded in lieu of reinstatement, but not in addition to it, where the circumstances make reinstatement impractical.").

Old Dominion does not contend that reinstatement is impractical or impossible due to underlying hostilities between the parties.  Old Dominion's briefing on the subject of reinstatement focuses entirely on the 2009 diagnosis and Grams' alleged disqualification from driving due to his failure to complete the SAP's treatment plan in the intervening years.  As the Court finds that Grams was not required to complete the SAP's treatment program recommended in 2009 for the reasons already explained above, there does not appear to be any barrier to reinstatement.[10]  Moreover, Grams specifically requests to be

---

[9]  Ironically, Old Dominion has emphasized in its briefing to the Court that Grams sought out and obtained gainful employment in the trucking industry almost immediately after being wrongfully terminated from Old Dominion.  Prior to driving for PepsiCo, Grams drove a truck briefly for Three-Way Transport and then worked as a dispatcher for USA Truck. *See* Doc. 293, p. 5, Old Dominion's Memorandum in Support of Its Motion for Remittur.

[10]  This assumes that Grams is otherwise presently and properly credentialed to drive a commercial vehicle and can provide appropriate proof of the same.

reinstated and avers that an amicable working relationship between the parties is certainly possible.

Accordingly, Old Dominion is **ORDERED** to reinstate Grams as a commercial truck driver, with full salary and benefits, within 30 days.  Grams will not be required to complete the SAP's 2009 recommended treatment program as a condition of reinstatement.  In light of the Court's decision in this regard, the EEOC's alternate request for an award of front pay is **MOOT**.

## V.  REMITTUR AND PREJUDGMENT INTEREST

Old Dominion maintains that Grams is not entitled to an award of prejudgment interest because such is not necessary to make him whole, in light of the jury's award of back pay.  Further, Old Dominion argues in its Motion for Remittur that Grams' back pay award was excessive and should be reduced by the Court.  To support its remittur argument, Old Dominion notes that the amount awarded by the jury was greater than the back-pay estimate the EEOC calculated in a proposed trial exhibit that was never introduced into evidence.

In analyzing the jury award, it is composed exclusively of damages for back pay and does not include an award for compensatory relief due to emotional distress, though the EEOC demanded such relief on Grams' behalf.  The Eighth Circuit has announced that its "scope of review over a damage award is extremely narrow," *Peoples Bank and Trust Co. of Mountain Home v. Globe Intern. Pub., Inc.*, 978 F.2d 1065, 1070 (8th Cir. 1992), and awards are reviewed "with a keen sense of respect for the latitude given to juries," *Kucia v. Southeast Ark. Comm. Action Corp.*, 284 F.3d 944, 948 (8th Cir. 2002).  Remittur should

be granted "only in cases where the jury's award is 'so grossly excessive as to shock the court's conscience.'" *Duty v. Norton-Alcoa Proppants*, 293 F.3d 481, 496 (8th Cir. 2002) (quoting *Kientzy v. McDonnell Douglas Corp.*, 990 F.2d 1051, 1061–62 (8th Cir.1993)).

In reviewing the jury's award of back pay, the Court does not find it so excessive as to shock the conscience, nor does the Court find that the award clearly exceeds the maximum amount the jury could reasonably find was fair to compensate Grams for his lost wages.   The jury heard the parties' stipulation that Grams earned $21.60 per hour as a driver for Old Dominion in 2009.  Grams testified that he averaged "maybe 45 hours per week" working for Old Dominion  (Doc. 300-2, p. 53).  The Jury could reasonably conclude that Grams was making approximately $50,000 per year at the time of his termination. The jury was also presented with Grams' tax returns for 2009 through 2011, which indicated earnings of approximately $36,000 to $37,000 per year  (Defense Exhibit 27).  And Grams testified that in the last several years he had earned about $36,000 to $37,000 as a driver for the Pepsi distributor  (Doc. 300-1 pp. 224-225).

As to the method for calculating damages, the Court properly instructed the jury. Final Jury Instruction 11 informed the jury that a proper calculation of back pay involved figuring the amount of wages Grams would have earned in his employment with Old Dominion from July 27, 2009, the date he was discharged, through the date of the jury's verdict, January 16, 2015.  (Doc. 279, p. 14).  The jury was also instructed to subtract the amount of earnings and benefits that Grams received from other employment during this time period in order to arrive at a net amount of back pay.  *Id.*  Finally, the jury heard testimony from Tony Strickland, a truck driver for Old Dominion, who testified that his current rate of pay in 2015 is $24.95 per hour (Doc. 300-2, p. 89), an amount

approximately 15% higher than the hourly wage Grams received in 2009.

In calculating a reasonable hourly wage for Grams from July 27, 2009 to January 16, 2015, and after subtracting the amounts Grams earned each year at other jobs, an award of $119,612.97 does not shock the conscience.  Although the Court cannot know exactly how the jury arrived at this figure, the amount is within reason.[11]

An award of prejudgment interest was prayed for in the Amended Complaint (Doc. 57) and is often presumed appropriate as "an element of complete compensation" in Title VII lawsuits in order to compensate a worker for the true cost of money damages he incurred.  *West Virginia v. United States*, 479 U.S. 305, 310 (1987).  The Supreme Court has held that it is in the Court's discretion to award prejudgment interest in discrimination cases, and that such awards are "a normal incident of suits against private parties" intended by Congress "to make persons whole for injuries suffered through past discrimination."  *Loeffler v. Frank*, 486 U.S. 549, 558 (1988) (internal quotation and citation omitted).   "Generally, prejudgment interest should be awarded 'unless exceptional circumstances exist making the award of interest inequitable.'"  *Frazier v. Iowa Beef Processors, Inc.*, 200 F.3d 1190, 1194 (8th Cir. 2000) (quoting *Stroh Container Co. v. Delphi Indus., Inc.*, 783 F.2d 743, 752 (8th Cir. 1986), *cert. denied*, 476 U.S. 1141, 106 (1986)); *EEOC v. Rath Packing Co.*, 787 F.2d 318, 333 (8th Cir. 1986) (affirming district

---

[11] Assuming Grams wages of $21.60 per hour remained static, then the net annual wage loss would be approximately $14,000 per year.  Total wage loss from 2009 through the end of 2014 would be $84,000.  However, the jury could have reasonably inferred from Tony Strickland's testimony that Grams would have received wage increases over the course of time.  Repeating the same calculations, but using Strickland's current rate of $24.95 per hour, would result in net annual wage loss of $22,000 per year. The resulting  total wage loss would be $132,000. Under the circumstances, the jury's award of $119,612.97, while certainly at the high end, is supported by the evidence and reasonable inferences.

court decision to refuse to award a high prejudgment interest award when there was evidence that the defendant was a financially vulnerable business, and principles of equity counseled against such an award).   Here, Old Dominion has presented no special circumstance to justify a denial of prejudgment interest on the jury's award of back pay.

The appropriate rate of interest is left to the discretion of the district court. *See N.Y. Marine & Gen. Ins. Co. v. Tradeline (L.L.C.)*, 266 F.3d 112, 130–31 (2d Cir. 2001); *Werner Enterprises, Inc. v. Westwind Mar. Int'l, Inc.*, 554 F.3d 1319, 1328 (11th Cir. 2009) ("In the absence of a controlling statute, the choice of a rate at which to set the amount of prejudgment interest is also within the discretion of a federal court.").   "That decision is 'guided by principles of reasonableness and fairness, by relevant state law, and by the relevant fifty-two week United States Treasury bond rate, which is the rate that federal courts must use in awarding post-judgment interest.'"   *In re Int'l Admin. Serv., Inc.*, 408 F.3d 689, 710 (quoting *Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH*, 141 F.3d 1434, 1447 (11th Cir. 1998) (citing 28 U.S.C. § 1961)).

Although 28 U.S.C. § 1961 does not concern prejudgment interest, the Eighth Circuit has concluded that § 1961 provides the proper measure for determining rates of both prejudgment and postjudgment interest. *Mansker v. TMG Life Ins. Co.*, 54 F.3d 1322, 1331 (8th Cir. 1995). Section 1961 provides that interest shall be calculated "at a rate equal to the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty-two week United States Treasury bills."

The annual yields on Treasury securities from July 2009 to January 2015 have

fluctuated from a low of .07% in September 2011, to a high of .49% In April 2010.  When the annual yields are averaged, the resulting rate is .28%.  Using this rate, the interest calculated on the judgment from July 27, 2009 to January 16, 2015 results in a total prejudgment interest award of $1,834.24.[12]

## V. BILL OF COSTS

The last issue before the Court is the matter of the EEOC's Bill of Costs.  On January 30, 2015, the EEOC submitted its Bill of Costs to the Court, requesting $6,477.67.  Old Dominion filed objections to the Bill of Costs, and, subsequently, the EEOC submitted a revised Bill of Costs (Doc. 304-2), requesting a reduced total of $5,578.76, composed of $140.60 in private process-server fees; $3,855.59 for deposition-related costs; $1,050.00 in deposition appearance fees for Old Dominion's expert witness, Dr. Mark Willenbring; $98.47 for printing fees for a demonstrative exhibit used at trial; and $434.10 in attendance and mileage costs associated with trial witnesses Bobby Sackman, Tony Strickland, Shannon Grams, and Charles Grams.  Old Dominion did not file further objections in response to the EEOC's revised Bill of Costs.

According to Federal Rule of Civil Procedure 54(d)(1), "[u]nless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party."  The Eighth Circuit has held that Rule 54(d) codifies a rebuttable presumption that the prevailing party is entitled to costs. *Leonard v. Sw. Bell*

---

[1] The Court arrives at this amount by making the following calculations: 0.0028/365= the daily rate of 0.00000767; daily rate x $119,612.97 = daily interest in the sum of $0.91757; daily interest x 1,999 days (July 27, 2009 through January 16, 2015) = total interest in the sum of $1,834.24. The Court concedes that more precise methodologies exist—but would be much more cumbersome to calculate. The Court finds the overall amount of interest produced by this method of calculation to be reasonable and appropriate.

*Corp. Disability Income Plan*, 408 F.3d 528, 533 (8th Cir. 2005) (citing *Martin v. DaimlerChrysler Corp*., 251 F.3d 691, 696 (8th Cir. 2001)).  The costs available under the Rule are itemized at 28 U.S.C. § 1920.  These costs are limited to:  (1) fees of the clerk and marshal; (2) fees for printed or electronically recorded transcripts necessarily obtained for use in the case; (3) fees and disbursements for printing and witnesses; (4) fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case; (5) docket fees under section 1923 of this title; and (6) compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

Not all expenses of litigation are costs taxable against the losing party, and within the costs eligible to be taxed, the district court has discretion in determining and awarding costs in a given case. *Crawford Fitting Co. v. J.T. Gibbons, Inc*., 482 U.S. 437, 441–42 (1987); *Pershern v. Fiatallis N. Am., Inc*., 834 F.2d 136, 140 (8th Cir. 1987).  The losing party bears the burden of proving that an award is inequitable under the circumstances. *Concord Boat Corp. v. Brunswick Corp*., 309 F.3d 494, 498 (8th Cir. 2002); *see also* 168th and Dodge, LP v. Rave Reviews Cinemas, LLC, 501 F.3d 945, 958 (8th Cir. 2007) (finding that a prevailing party is presumptively entitled to recover all of its costs, and the losing party must suggest a rationale under which the district court's actions constitute an abuse of discretion).

29

## A.  Private Process Servers

Old Dominion objects to the EEOC's inclusion of $140.60 in private process-server fees.  The Eighth Circuit held in *Crues v. KFC Corp.* that fees associated with the use of private process servers cannot be recovered by a prevailing party pursuant to 28 U.S.C. § 1920, as such fees are not included in the statute.  768 F.2d 230, 234 (8th Cir. 1985).  As *Crues* controls on this issue, the EEOC's request for $140.60 in private process-server fees must be excluded from the Bill of Costs.

## B.  Deposition Costs

Old Dominion argues that certain deposition costs claimed by the EEOC are not properly taxable because the depositions were not used at trial and/or the depositions were purely investigative or preparatory in nature.   The relevant inquiry with respect to the taxation of deposition costs is whether the depositions were "necessarily obtained for use in the case" at the time they were taken.   28 U.S.C. §1920; 10 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2676 at 434 (3d ed. 2014) ("When a deposition is not actually used at trial or as evidence on some successful preliminary motion, whether its cost may be taxed generally is determined by deciding if the deposition reasonably seemed necessary at the time it was taken).  Costs are taxable for depositions relied on by the court in ruling on a motion for summary judgment, *Zotos v. Lindbergh Sch. Dist.*, 121 F.3d 356, 363 (8th Cir. 1997), as well as depositions used for purposes of trial.

Here, the EEOC claims deposition costs associated with David Bates, Charles Grams, Brian Stoddard, Luke Rhodes, and Tilden Thornton.   All of these witness's

30

depositions were relied upon by the EEOC to prepare for trial and/or to support the EEOC's motions for summary judgment that were filed previously in the case.  The costs associated with taking Michael Brady's deposition are also taxable, even though he never testified at trial, as Old Dominion certainly intended to call him as a trial witness, and it was not until the week before trial at the pretrial conference that the Court determined Brady's testimony should be excluded.  Finally, costs associated with the EEOC's deposition of Old Dominion's expert witness, Dr. Mark Willenbring, are also taxable, as this deposition was necessary for the EEOC to prepare for trial, particularly as to the cross-examination of Willenbring.

In consideration of the above, the Court finds that all costs requested by the EEOC related to depositions are taxable, and Old Dominion is ordered to pay $3,855.59 for these costs.

### C.  Printing Costs

The EEOC claims $98.47 in printing costs associated with a demonstrative exhibit that was used during closing argument.  It was necessary for the EEOC to incur these costs, and they are therefore taxable.

### D.  Lay Witness Travel and Attendance Costs

The EEOC claims travel and attendance costs for trial witnesses Bobby Sackman ($54.85), Tony Strickland ($48.25), Shannon Grams ($84.40), and Charles Grams ($246.60).  Old Dominion did not object to these costs, and they will be taxed.  A total of $434.10 will be ordered to be paid.

### E.  Expert Witness Deposition Fee

The EEOC requests reimbursement of $1,050.00 it paid Old Dominion's expert, Mark Willenbring, to attend his three-hour deposition.  Willenbring charged $350.00 per hour to appear, and Old Dominion contends that this hourly fee is not properly taxable.

The EEOC cites the Court to the Eighth Circuit case of *Nebraska Public Power District v. Austin Power, Inc.*, in which a district court's decision to award expert witness fees was affirmed on appeal.  773 F.2d 960, 975-76 (8th Cir. 1985).  An award of expert witness fees is proper under Rule 54(d) "if, after carefully scrutinizing the prevailing party's bill of costs, the district court determines that the expert's testimony was crucial to the issues decided and the expenditures were necessary to the litigation."  *Id.* at 975.

In the case at bar, the Court determined at the pretrial conference, when ruling on the EEOC's motion in limine to exclude the testimony of Dr. Willenbring, that his testimony would be helpful to the jury in understanding the central issue in the case of alcohol addiction.  The Court therefore finds that expenditures associated with deposing Dr. Willenbring were crucial to the issues decided and necessary to the litigation.  Costs in the amount of $1,050.00 will therefore be awarded to the EEOC for this expense.

### VI.  CONCLUSION

In light of the analysis above, the Court finds that Old Dominion's Policy violates the ADA.  Any proposed accommodation that does not provide the driver with at least the possibility of a return to his former job or a comparable job is not reasonable as a matter of law.  Further, an employer with a self-reporting policy that fails to qualify under 49 C.F.R. § 382.121 is not, as a matter of law, required to refer a self-reporting driver to an SAP for

referral and treatment, as set forth in 49 C.F.R. §§ 40.281(a) and 40.285(a), unless the driver has committed a violation of Subpart B of the DOT regulations; however, the employer is at liberty to consider the SAP treatment process as a potential reasonable accommodation pursuant to the ADA.

As the Policy violates the ADA, it is permanently enjoined.  The Court declines to order further injunctive relief as requested by the EEOC in its Motion (Doc. 291, pp. 18-21).

After careful review of the evidence presented at trial, the Court also finds that a reasonable jury could have concluded that Grams was disabled and suffered an adverse employment action due to disability discrimination.  The EEOC presented evidence sufficient to show that Grams' alcoholism substantially limited several major life activities, including but not limited to walking, standing, thinking, communicating, and caring for himself.  The EEOC also demonstrated that Grams was a "qualified individual" under the ADA who was denied a reasonable accommodation by Old Dominion.  The nature of Old Dominion's Policy was such that it refused to perform any individualized analysis or consider any reasonable accommodation that could allow an employee who proactively self-reported an alcohol problem to potentially return to driving.  There was also sufficient evidence presented at trial that Old Dominion's offer to Grams of employment in a part-time dock worker position was not a reasonable accommodation.

Considering the nature of the evidence before the jury, no new trial is warranted, and the jury's award of $119,612.97 in back pay to Grams will stand, as it is supported by the evidence presented at trial.  Grams is entitled to reinstatement to his former job as a commercial truck driver with Old Dominion, with full salary and benefits, within 30 days of the file date of this Memorandum Opinion, and he will not be required to complete the

33

SAP's 2009 recommended treatment program as a condition of reinstatement. Grams is also entitled to an award of prejudgment interest in the amount of $1,834.24.

Finally, the EEOC, as the prevailing party in this lawsuit, is entitled to reimbursement of its costs, which the Court has determined total $5,438.16.

An Order and Final Judgment summarizing the Court's rulings on all pending Motions will issue separately.

**IT IS SO ORDERED** this 24th day of June, 2015.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE